UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MICHAEL TYREE**, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**OPTIMIZELY NORTH AMERICA INC.** and **MUTUAL OF OMAHA INSURANCE COMPANY**,<br><br>Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Michael Tyree ("Plaintiff"), on behalf of himself and all others similarly situated ("Class Members"), alleges the following Class Action Complaint (the "Action") against Optimizely North America Inc. ("Optimizely") and Mutual of Omaha Insurance Company ("Mutual of Omaha") (collectively, "Defendants") upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of counsel, as follows:

## I. INTRODUCTION

1. Plaintiff seeks monetary damages and injunctive and declaratory relief for injuries arising from Defendants' failure to safeguard the Personally Identifiable Information[1] ("PII" or "Private Information") of Plaintiff and Class Members from unauthorized capture by malicious

---

[1] The Federal Trade Commission ("FTC") defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 16 C.F.R. § 603.2(b). To be clear, not every type of information included in that definition was compromised in the Data Incident.

code that cybercriminals injected into Defendant Optimizely's web experimentation platform and that Defendants allowed to execute on Defendant Mutual of Omaha's website on November 16, 2026, and the resulting compromise and unauthorized disclosure of that Private Information, causing widespread injury and damages to Plaintiff and the proposed Class (defined below).

2. Defendant Mutual of Omaha is a nationwide insurance and financial services company providing life, health, and supplemental insurance, employee benefits, investment services, and residential mortgage lending, including traditional and reverse mortgages.[2]

3. Defendant Optimizely is a digital experience and experimentation software company that provides businesses with tools to conduct A/B testing, personalize websites and mobile applications, manage digital content, and optimize customer experiences.[3] The companies that contract with Defendant Optimizely for its services are hereinafter referred to as "Defendant Optimizely's Client(s)" or "Client(s)." Defendant Mutual of Omaha is a Client of Defendant Optimizely.

4. Defendant Optimizely's platform operates by delivering JavaScript code from Defendant Optimizely's systems and content delivery network directly into the web pages of its Clients, where that code executes in the browsers of the Clients' customers and website visitors, including on pages where those customers enter their Private Information. Defendant Optimizely therefore controlled code that ran on the very web pages where Plaintiff and Class Members

---

[2] https://www.mutualofomaha.com/ (last visited Nov. 24, 2026); *see also* https://www.mutualofomaha.com/about/company-profile/affiliates (last visited Nov. 24, 2026); https://cdn.mutualofomaha.com/mutualofomaha/documents/pdfs/newsroom/mutual-of-omaha-overview.pdf (last visited Nov. 24, 2026).

[3] https://www.optimizely.com/company (last visited Nov. 24, 2026); *see also* https://www.optimizely.com/products (last visited Nov. 24, 2026).

entered their Private Information, and was responsible for ensuring that only authorized, legitimate code was delivered through its platform.

5. Defendant Mutual of Omaha, in turn, chose to embed Defendant Optimizely's code on its own websites, including on pages where Plaintiff and Class Members entered their Private Information, and was responsible for vetting, monitoring, and controlling the third-party code it allowed to run on those pages.

6. On November 19, 2026, Defendant Optimizely posted a Security Advisory: Web Experimentation Security Incident notice on its website acknowledging the Data Incident ("Online Notice").[4]

7. Plaintiff and Class Members directly or indirectly provided Defendants with sensitive, non-public Private Information in connection with the services Defendants provide. Defendants could not perform their regular business activities without this Private Information.

8. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

9. The Private Information compromised in the Data Incident includes, upon information and belief and due to the nature of the malicious code and the services that Defendants provide, sensitive PII.

10. According to security researchers at Report URI, on or around November 16, 2026, cybercriminals injected malicious JavaScript code into Defendant Optimizely's web experimentation platform, which was loaded on Defendant Mutual of Omaha's website,

---

[4] https://support.optimizely.com/hc/en-us/articles/50521849710605-Security-Advisory-Web-Experimentation-Security-Incident-Updated-November-19-2026 (last visited Nov. 24, 2026).

www.mutualofomaha.com, and that malicious code was served to visitors of Defendant Mutual of Omaha's website (the "Data Incident").[5]

11. According to Report URI, the malicious code skimmed payment card information, stole cookies and screenshots, swapped cryptocurrency wallet addresses, and delivered exploit kits to certain iPhone and iPad users.[6] Report URI identified at least 178 organizations whose websites served the malicious code, and listed Defendant Mutual of Omaha's domain, www.mutualofomaha.com, among them.[7]

12. Defendants' failure to safeguard Plaintiff's and Class Members' highly sensitive Private Information violates their common law duty, industry standards, consumer expectations, state law, public policy, and Defendants' implied and third-party beneficiary contracts with Plaintiff and Class Members to safeguard their Private Information.

13. Defendants could have prevented this Data Incident by implementing reasonable, expected, and industry-standard data security measures, including controls over who could write code into Defendant Optimizely's platform and controls over what third-party code could execute on Defendant Mutual of Omaha's payment pages, or, as to Defendant Mutual of Omaha, by requiring and ensuring that its third-party vendors, including Defendant Optimizely, implement reasonable, expected, and industry-standard data security measures. Instead, Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, and/or negligently failing to implement or require these measures to be implemented to safeguard Plaintiff's and Class Members' Private Information and by failing to take necessary steps to

[5] https://blog.report-uri.com/worlds-largest-brands-infected-with-malware-via-optimizely/ (last visited Nov. 24, 2026).
[6] *Id.*
[7] *Id.*

prevent unauthorized disclosure of that information. Defendants' woefully inadequate data security measures and practices made the Data Incident a foreseeable, and even likely, consequence of their negligence.

14. Plaintiff and Class Members would not have provided their valuable Private Information had they known that Defendants would, *inter alia*, allow unvetted and unmonitored third-party code to execute on the web pages where Plaintiff and Class Members entered their Private Information, fail to control access to the platform that delivered that code, and fail to detect that malicious code was capturing and transmitting their Private Information to cybercriminals.

15. Plaintiff and Class Members now face a substantial and continuing risk of fraud and identity theft due to the nature of the information compromised, which cannot be made private again.

16. Defendants' harmful conduct has injured Plaintiff and Class Members in multiple ways, including: (i) the lost or diminished value of their Private Information; (ii) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (iii) lost opportunity costs to mitigate the Data Incident's consequences, including lost time; and (iv) emotional distress associated with the loss of control over their highly sensitive Private Information.

17. Upon information and belief, Plaintiff's Private Information is available on the dark web as a result of the Data Incident.

18. On behalf of himself and the Class preliminarily defined below, Plaintiff brings causes of action against Defendants for negligence, negligence *per se*, breach of implied contract, breach of third-party beneficiary contract, and unjust enrichment, seeking an award of monetary

damages and injunctive and declaratory relief, resulting from Defendants' failure to adequately protect Plaintiff's and Class Members' highly sensitive Private Information.

## II. PARTIES

19. Plaintiff is, and at all times mentioned herein was, an individual resident and citizen of Rural Hall, North Carolina.

20. Defendant Optimizely is a corporation organized under the laws of Delaware with its headquarters and principal place of business at 119 5th Avenue, 7th Floor, New York, New York 10003.

21. Defendant Mutual of Omaha is an insurance company organized under the laws of Nebraska with its headquarters and principal place of business at 3300 Mutual of Omaha Plaza, Omaha, Nebraska 68175.

## III. JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendants, namely, Plaintiff, a citizen of North Carolina.

23. This Court has personal jurisdiction over Defendants because Defendant Optimizely's principal place of business is in this District, it regularly conducts business in this District, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

24. Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant Optimizely's principal place of business is in this District.

## IV. FACTUAL ALLEGATIONS

### A. *Defendants' Businesses*

25. Defendant Mutual of Omaha is a nationwide insurance and financial services company providing life, health, and supplemental insurance, employee benefits, investment services, and residential mortgage lending, including traditional and reverse mortgages.[8]

26. Defendant Optimizely is a digital experience and experimentation software company that provides Clients with tools to conduct A/B testing, personalize websites and mobile applications, manage digital content, and optimize customer experiences.[9] Defendant Mutual of Omaha is a Client of Defendant Optimizely.

27. Plaintiff and Class Members directly or indirectly provided their Private Information to Defendants in exchange for the services Defendants provide. Specifically, Plaintiff and Class Members entered their Private Information directly on Defendant Mutual of Omaha's website, and that information was entered on web pages on which Defendant Optimizely's code was loaded and executed.

28. At the time of the Data Incident, Plaintiff's and Class Members' Private Information was entered on, and collected through, web pages that Defendants controlled and that executed code delivered through Defendant Optimizely's platform.

29. Upon information and belief, and through their privacy policies ("Privacy Policies"),[10] Defendants made promises and representations to Plaintiff and Class Members that

---

[8] https://www.mutualofomaha.com/ (last visited Nov. 24, 2026); *see also* https://www.mutualofomaha.com/about/company-profile/affiliates (last visited Nov. 24, 2026); https://cdn.mutualofomaha.com/mutualofomaha/documents/pdfs/newsroom/mutual-of-omaha-overview.pdf (last visited Nov. 24, 2026).

[9] https://www.optimizely.com/company (last visited Nov. 24, 2026); *see also* https://www.optimizely.com/products (last visited Nov. 24, 2026).

[10] https://www.mutualofomaha.com/legal-services (last visited Nov. 24, 2026) ("The security of your personal information is very important to us, and we are committed to protecting the

the Private Information collected in connection with the services Defendants provide would be kept safe and confidential, and that Defendants would implement appropriate technical and organizational measures to protect the Private Information.

30. Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

31. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

32. Plaintiff and Class Members relied on the sophistication of Defendants to keep the Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information.

33. Plaintiff and Class Members value the confidentiality of the Private Information and demand security to safeguard their Private Information.

34. Defendants had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class Members from involuntary disclosure to third parties.

---

information we collect. We have security measures in place that seek to protect against the loss, misuse or alteration of information that Mutual of Omaha has collected from you through our sites."); *see also* https://www.optimizely.com/trust-center/security (last visited Nov. 24, 2026) ("Optimizely has instituted several technical and organizational measures designed to protect Optimizely Applications… By default, all communications from your end-users and visitors on Optimizely products are encrypted using industry standard communication encryption technology. Optimizely currently uses Transport Layer Security (TLS) and updates to cipher suites and configurations as vulnerabilities are discovered… Optimizely regularly updates network architecture schema and maintains an understanding of the data flows between systems. Firewall rules and access restrictions are reviewed for appropriateness on a regular basis… Optimizely uses an Intrusion Detection System (IDS), Security Incident Event Management (SIEM) system and other security monitoring tools on production servers that host Optimizely products… Optimizely segregates all customer data and provide strong programmatic and access controls to logically isolate your data from that of other customers."); https://www.optimizely.com/legal/privacy-notice (last visited Nov. 24, 2026).

Defendants have a legal duty to keep Plaintiff's and Class Members' Private Information safe and confidential.

35. Defendants had obligations under Section 5 of the Federal Trade Commission Act ("FTC Act"), contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

36. Defendants derived a substantial economic benefit from collecting Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendant Mutual of Omaha could not perform the services it provides to Plaintiff and Class Members, and Defendant Optimizely could not perform the services for which Defendant Mutual of Omaha paid it.

37. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

38. Defendant Optimizely, as a technology vendor whose platform delivers code directly into its Clients' web pages, owed Plaintiff and Class Members a duty to implement reasonable security measures to prevent unauthorized persons from writing, modifying, or distributing code through its platform, including strong authentication and access controls for the accounts and fields through which code could be added to Client projects, review and approval of code changes, integrity monitoring of the code it served, and timely detection of and response to malicious code.

39. Defendant Mutual of Omaha owed Plaintiff and Class Members a duty to properly vet, monitor, and audit Defendant Optimizely and any other vendor whose code it allowed to execute on its website, to ensure those vendors' data security measures were sufficient to protect Plaintiff's and Class Members' Private Information, and to implement its own controls governing which third-party scripts could run on, and transmit data from, its payment and data-entry pages.

### *B. The Malicious Code Injection and Data Incident*

40. On November 16, 2026, cybercriminals injected malicious JavaScript code into Defendant Optimizely's web experimentation platform, which was loaded on Defendant Mutual of Omaha's website, www.mutualofomaha.com, and that malicious code was served to visitors of Defendant Mutual of Omaha's website.[11]

41. The cybercriminals wrote their own code into a custom code field of Defendant Optimizely's Clients' projects, and the malicious code was then served from the platform's trusted content delivery network, so that visitors' web browsers treated it as legitimate.[12]

42. Report URI further reported that the malicious code watched form submissions on affected websites for a card number, expiration date, and security code (CVV), and, once it had all three, sent them to a server controlled by the cybercriminals.[13] Report URI's report estimates that the malicious code may have been served during roughly 34 million page visits.[14]

43. On November 19, 2026, Defendant Optimizely posted the Online Notice on its website acknowledging the Data Incident, stating as follows:

---

[11] https://blog.report-uri.com/worlds-largest-brands-infected-with-malware-via-optimizely/ (last visited Nov. 24, 2026).
[12] *Id.*
[13] *Id.*
[14] Jon Jackson, *Cyber Attack Hits 178 Major Websites: Full List of Organizations*, NEWSWEEK, https://www.newsweek.com/cyber-attack-websites-affected-12725863 (last visited Nov. 24, 2026).

> On 16 November 2026, an unauthorized third party exploited a flaw in the Optimizely Web Experimentation account signup flow. They used it to impersonate users on targeted customer accounts and insert malicious JavaScript into those customers' projects.[15]

44. The Private Information compromised in the Data Incident includes, upon information and belief, significant amounts of sensitive PII.

45. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information Plaintiff and Class Members entered on Defendant Mutual of Omaha's website. Defendant Optimizely failed to prevent unauthorized persons from inserting malicious code into its Clients' projects and failed to detect that its platform was distributing malicious code. Defendant Mutual of Omaha failed to restrict, monitor, or verify the integrity of the third-party code running on its payment pages and failed to adequately vet and monitor Defendant Optimizely. These failures caused the exposure of Private Information.

46. As a result, the cybercriminals captured and acquired the Private Information of Plaintiff and Class Members that was entered on Defendant Mutual of Omaha's website. Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Incident.

47. Upon information and belief, Plaintiff's Private Information has been disseminated on the dark web, and Plaintiff further believes that the Private Information of Class Members was subsequently sold on the dark web following the Data Incident, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

48. Upon information and belief, neither Defendant has provided Plaintiff and Class Members with individualized notice of the Data Incident, the specific information compromised, or the period during which the malicious code ran on Defendant Mutual of Omaha's website.

---

[15] https://support.optimizely.com/hc/en-us/articles/50521849710605-Security-Advisory-Web-Experimentation-Security-Incident-Updated-November-19-2026 (last visited Nov. 24, 2026).

### C. *Defendants Failed to Comply with FTC Guidelines and Industry Standards*

49. Federal and state regulators have established security standards and issued recommendations to prevent data breaches and the resulting harm to consumers. There are a number of state and federal laws, requirements, and industry standards governing the protection of Private Information.

50. The FTC has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be considered for all business decision-making.[16]

51. Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[17]

52. The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of data being siphoned from the system, and have a response plan in the event of a breach.

53. The FTC advises companies to not keep information for periods of time longer than needed to authorize a transaction, restrict access to private information, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for

[16] *Start With Securit*y, Fed. Trade Comm'n ("FTC"), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Nov. 24, 2026).

[17] *Protecting Personal Information: A Guide for Busines*s, FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Nov. 24, 2026).

suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[18]

54. The FTC has brought enforcement actions against companies for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or practice barred by the FTC Act, 15 U.S.C. § 45. Orders originating from these actions further elucidate the measures businesses must take to satisfy their data security obligations.

55. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

56. Defendants' failure to verify that third-party service providers, including Defendant Optimizely, had implemented reasonable security measures, and Defendant Optimizely's failure to implement reasonable security measures as a service provider to its Clients, constitute unfair acts or practices prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

57. Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential cyber-attacks that affect businesses every day and propose solutions to defend against those cyber-attacks.[19] All organizations collecting and handling Private Information, such as Defendants, are strongly encouraged to follow these controls.

58. Additionally, cybersecurity firms have promulgated a series of best practices that at a minimum should be implemented by sector participants including, but not limited to: installing

---

[18] *Id.*

[19] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Nov. 24, 2026).

appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; protecting against any possible communication system; and training staff regarding critical points.[20]

59. Other best practices include, but are not limited to, securely configuring business software, managing access controls and vulnerabilities to networks, systems, and software, maintaining network infrastructure, defending networks, adopting data encryption while data is both in transit and at rest, limiting access to sensitive information to only necessary employees, and securing application software.[21]

60. The Payment Card Industry Data Security Standard ("PCI DSS") specifically addresses the threat of malicious scripts on payment pages. PCI DSS version 4.0 requires that all scripts loaded and executed on payment pages be authorized, that their integrity be assured, and that an inventory of them be maintained (Requirement 6.4.3), and that a change- and tamper-detection mechanism alert personnel to unauthorized modifications to payment pages (Requirement 11.6.1).

61. Other widely adopted and readily available controls designed to prevent and detect malicious third-party code include Content Security Policy headers that restrict where scripts may load from and where data may be sent; Subresource Integrity checks that block scripts whose contents have been altered; isolating payment fields from third-party scripts; and client-side script monitoring that alerts when scripts change or transmit data to unfamiliar domains. For a platform

---

[20] *See Addressing BPO Information Security: A Three-Front Approac*h, DATAMARK, INC. (Nov. 2016), https://insights.datamark.net/addressing-bpo-information-security (last visited Nov. 24, 2026).

[21] *See* Center for Internet Security, *Critical Security Control*s (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Nov. 24, 2026).

provider like Defendant Optimizely, standard controls also include multi-factor authentication and least-privilege access for accounts able to publish code, review and approval of code changes, logging and alerting on code changes, and scanning of published code for malicious behavior.

62. The following frameworks incorporate these data security measures and others and are regularly employed as industry standard practices: the NIST Cybersecurity Framework 2.0 (including without limitation PR.AA-01, PR.AA-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04); NIST Special Publications 800-53, 800-53A, and 800-171; the Federal Risk and Authorization Management Program (FedRAMP); and the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

63. Defendants failed to follow these and other industry standards to adequately protect the Private Information of Plaintiff and Class Members. Had Defendant Optimizely implemented reasonable access, change-control, and code-integrity measures, the cybercriminals could not have placed malicious code into its Clients' projects; and had Defendant Mutual of Omaha implemented reasonable payment-page script controls and adequately vetted and monitored Defendant Optimizely, the malicious code could not have executed on its website or transmitted Plaintiff's and Class Members' Private Information to the cybercriminals.

### *D. Data Incidents Are Preventable*

64. Data incidents like this one are preventable.[22] As Lucy Thomson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have

[22] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thomson, ed., 2012), *available at* https://lawcat.berkeley.edu/record/394088 (last visited Nov. 24, 2026).

been prevented by proper planning and the correct design and implementation of appropriate security solutions."[23] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[24]

65. The prevalence of data breaches, data incidents, and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities. Data breaches have been on the rise for several years. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by more than 2,600 percent since 2018, and the estimated number of victims has increased by more than 1,400 percent. The 2023 compromises represent a 78 percent increase over the previous year and a 72 percent increase over the previous all-time high number of compromises (1,860) set in 2021.

66. In light of recent high-profile data breaches at other industry-leading companies, including T-Mobile USA, Inc. (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), and NCB Management Services, Inc. (1 million records, February 2023), and the widely publicized wave of web-skimming attacks in which cybercriminals inject malicious code into e-commerce websites and third-party scripts to steal payment card data and other Private Information, Defendants knew or should have known that the Private Information entered on Defendant Mutual

[23] *Id.* at 17.
[24] *Id.* at 28.

of Omaha's website, and the code delivered through Defendant Optimizely's platform, would be targeted by cybercriminals.

67. Additionally, as companies became more dependent on computer systems to run their business,[25] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[26]

68. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendants' data security measures were compromised, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of such a compromise.

69. Defendants were, or should have been, fully aware of the sensitive nature and significant volume of Private Information entered on Defendant Mutual of Omaha's website, amounting to, upon information and belief, thousands of individuals' Private Information, and, thus, the significant number of individuals who would be harmed by its compromise.

### ***E. The Data Incident Increases Plaintiff's and Class Members' Risk of Identity Theft***

70. The Private Information of Plaintiff and Class Members will end up (if it has not already ended up) for sale on the dark web, as that is the *modus operandi* of the cybercriminals responsible for the Data Incident.

---

[25] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last visited Nov. 24, 2026).

[26] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last visited Nov. 24, 2026).

71. The ramifications of Defendants' failure to secure Plaintiff's and Class Members' data are severe. Victims of data incidents are much more likely to become victims of identity theft and other types of fraudulent schemes.

72. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[27] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[28]

73. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and financial information like the Private Information at issue here. The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the Internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[29]

74. When the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [Private Information] belonging to victims from countries all over the world. One of the key challenges of protecting Private Information online is

---

[27] 16 C.F.R. § 603.2(a).
[28] *Id.* § 603.2(b).
[29] *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Nov. 24, 2026).

its pervasiveness. As data breaches in the news continue to show, Private Information about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[30]

75. Identity thieves can use the Private Information that Defendants failed to keep secure to perpetrate a variety of crimes that harm victims. For instance, stolen payment card data can be used to make fraudulent purchases, and combined with other information, can be used to commit various types of government fraud, such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

76. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[31]

77. Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts known as social engineering or spear phishing. In these

---

[30] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018, https://www.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited Nov. 24, 2026).

[31] United States Government Accountability Office, Report to Congressional Requesters, Personal Information (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited Nov. 24, 2026).

forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to target them with spam emails or solicitations to deceive the victim into providing the criminal with additional personal information.

78. Phishing scammers use emails and text messages to trick people into giving them their personal information, including but not limited to passwords, account numbers, and Social Security numbers. Phishing scams are frequently successful, and the FBI reported that people lost approximately $18.7 million to such scams in 2023 alone.[32]

79. Accordingly, providing credit monitoring or reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. Javelin Strategy & Research reported that "[f]raud-related resolution hours skyrocketed in 2023. The average amount of time consumers spent in 2022 resolving issues stemming from identity fraud clocked in at six hours, but in 2023, fraud resolution hours rose steeply, jumping to a nearly 10-hour average, a major disruption for consumers and financial institutions alike."[33]

80. Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting credit bureaus to place a fraud alert, reviewing their credit reports, placing a credit freeze on their credit, and correcting their credit reports.[34] The result is that Plaintiff and Class Members are

---

[32] *Internet Crime Report*, FEDERAL BUREAU OF INVESTIGATION (2023), https://www.ic3.gov/annualreport/reports/2023_ic3report.pdf (last visited November 24, 2026).
[33] Javelin Strategy & Research, *2024 Identity Fraud Study: Resolving the Shattered Identity Crisis* (2024), *available at* https://javelinstrategy.com/research/2024-identity-fraud-study-resolving-shattered-identity-crisis (last visited Nov. 24, 2026).
[34] *See* https://www.identitytheft.gov/Steps (last visited Nov. 24, 2026).

forced to spend their own personal time, or take time from work, to respond to the Data Incident, and Defendants have not offered to compensate them for this loss of time.

81. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Incident, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm–yet the resource and asset of time has been lost.

82. Because certain of the information stolen in the Data Incident, such as session cookies and screenshots of web pages containing personal details, cannot simply be changed, and because stolen payment card data is routinely combined with other information to commit further fraud, it can be used to perpetrate fraud and identity theft for years. Plaintiff and Class Members now face years of constant surveillance of their financial records, monitoring, and loss of rights.

83. Stolen Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members.

84. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members because of the Data Incident.

85. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other

criminals who then utilize the information to commit a variety of identity theft-related crimes discussed below.

86. Plaintiff's and Class Members' Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Incident has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit from their misfortune.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

87. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Incident, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

88. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

89. Plaintiff and Class Members have spent time, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

90. Plaintiff's mitigation efforts are consistent with a report released in 2007 by the U.S. Government Accountability Office regarding data breaches ("GAO Report"), in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[35]

---

[35] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full

91. Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[36]

92. And for those Class Members who experience actual identity theft and fraud, the GAO Report noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

***Diminution of Value of Private Information***

93. Private Information is valuable property.[37] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

94. The Private Information stolen in the Data Incident, including, upon information and belief, payment card data together with card security codes and associated browsing and session information, is particularly valuable to criminals because it can be used immediately to make fraudulent purchases and, combined with other data, to target victims for further fraud.

---

Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited Nov. 24, 2026).

[36] *See* Federal Trade Commission, *IdentityTheft.gov*, https://www.identitytheft.gov/Steps (last visited Nov. 24, 2026).

[37] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Nov. 24, 2026).

95. This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[38]

96. An active and robust legitimate marketplace for Private Information also exists. The global data broker market size was valued at USD 278.0 billion in 2024 and is projected to grow from USD 307.3 billion in 2026 to USD 512.5 billion by 2033.[39]

97. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[40,41] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[42]

98. As a result of the Data Incident, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property,

---

[38] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Nov. 24, 2026).

[39] https://www.grandviewresearch.com/industry-analysis/data-broker-market-report (last visited Nov. 24, 2026).

[40] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Nov. 24, 2026).

[41] https://datacoup.com/ (last visited Nov. 24, 2026).

[42] https://www.thepennyhoarder.com/make-money/nielsenpanel/#:~:text=Sign%20up%20to%20join%20the,software%20installed%20on%20your%20computer (last visited Nov. 24, 2026).

resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

99. The fraudulent activity resulting from the Data Incident may not come to light for years.

100. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

101. Defendants were, or should have been, fully aware of the sensitive nature and significant volume of Private Information entered on Defendant Mutual of Omaha's website and processed through web pages running Defendant Optimizely's code, amounting to thousands of individuals' Private Information and, thus, the significant number of individuals who would be harmed by its compromise.

102. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

103. Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in this Data Incident, and the sensitive type of Private Information involved in this Data Incident, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

104. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

105. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

106. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from the Data Incident. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear, but for Defendants' failure to safeguard their Private Information.

***Loss of the Benefit of the Bargain***

107. Furthermore, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When seeking services from Defendant Mutual of Omaha, Plaintiff and other reasonable individuals understood and expected that they were, in part, paying for the service and necessary data security to protect the Private Information they entered on Defendant Mutual of Omaha's website when, in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant Mutual of Omaha.

***Plaintiff's Experience***

108. Plaintiff is a client of Defendant Mutual of Omaha. Plaintiff provided his Private Information to Defendant Mutual of Omaha in connection with the services Defendant Mutual of Omaha provides.

109. Upon information and belief, Plaintiff entered his Private Information on Defendant Mutual of Omaha's website while the malicious code delivered through Defendant Optimizely's platform was active on that website. Accordingly, Plaintiff is a victim of the Data Incident.

110. Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant Mutual of Omaha had he known of Defendants' lax data security practices, including that Defendants allowed unvetted, unmonitored third-party code to run on the web pages where he entered his Private Information.

111. As a result of the Data Incident, Plaintiff made reasonable efforts to mitigate the impact of the Data Incident, including checking his bills and accounts to make sure they were correct, verifying the legitimacy of the Data Incident, and other necessary mitigation efforts. Plaintiff has spent significant time dealing with the Data Incident, valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

112. Plaintiff suffered actual injury from having the Private Information he provided to Defendant Mutual of Omaha compromised as a result of the Data Incident including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate

the actual consequences of the Data Incident; (v) statutory damages; (vi) nominal damages; and (vii) the continued and certainly increased risk to his Private Information, which is now in the hands of cybercriminals and available for further misuse.

113. The Data Incident has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not informed him of key details about the Data Incident's occurrence.

114. As a result of the Data Incident, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Incident.

115. As a result of the Data Incident, Plaintiff is presently at risk and will continue to be at increased risk of identity theft and fraud for years to come.

116. Plaintiff has a continuing interest in ensuring that Defendants implement reasonable security measures to prevent malicious code from executing on Clients' websites and from being distributed through Defendant Optimizely's platform, so that his Private Information is protected and safeguarded from future data incidents.

## V. CLASS ACTION ALLEGATIONS

117. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), on behalf of the following class:

> **Nationwide Class**
> All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Incident (the "Class").

118. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which either Defendant has a controlling interest; all individuals who make a timely election to be

excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

119. Plaintiff reserves the right to amend the definitions of the Class or add a class or subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

120. Numerosity. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiff and exclusively in the possession of Defendants, upon information and belief, thousands of individuals were impacted. The Class is readily identifiable within Defendants' records.

121. Commonality and Predominance. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class Members are the following:

a. Whether Defendants engaged in the conduct alleged herein;

b. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' Private Information from unauthorized access and disclosure;

c. Whether Defendants' data security practices, including Defendant Optimizely's controls over code published through its platform and Defendant Mutual of Omaha's controls over third-party code on its website, violated the FTC Act, industry standards, and/or state laws, and/or Defendants' other duties discussed herein;

d. Whether Defendant Mutual of Omaha failed to properly vet, audit, and monitor Defendant Optimizely and ensure its data security measures were sufficient to protect Plaintiff's and Class Members' Private Information;

e. Whether Defendants failed to adequately respond to the Data Incident, and whether this caused damages to Plaintiff and Class Members;

f. Whether Defendants unlawfully shared, lost, or disclosed Plaintiff's and Class Members' Private Information;

g. Whether Defendants' data security systems prior to and during the Data Incident complied with applicable data security laws and regulations;

h. Whether Plaintiff and Class Members suffered injury as a proximate result of Defendants' negligent actions or failures to act;

i. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' Private Information;

j. Whether Defendants breached duties to protect Plaintiff's and Class Members' Private Information;

k. Whether Defendants' actions and inactions alleged herein were negligent;

l. Whether Defendants were unjustly enriched by their conduct as alleged herein;

m. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

n. Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

o. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

122. Typicality. Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

123. Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

124. Adequacy. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

125. Superiority and Manageability. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

126. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

127. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

128. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

129. Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the Private Information of Class Members and may continue to act unlawfully as set forth in this Complaint.

130. Further, Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

131. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, processing, and safeguarding their Private Information;

b. Whether Defendants' security measures, including controls over code published through Defendant Optimizely's platform and third-party code executing on Defendant Mutual of Omaha's website, were reasonable in light of best practices recommended by data security experts;

c. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

d. Whether Defendants failed to take commercially reasonable steps to safeguard individuals' Private Information; and

e. Whether adherence to FTC data security recommendations, PCI DSS requirements, and measures recommended by data security experts would have reasonably prevented the Data Incident.

## VI. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

132. Plaintiff hereby repeats and realleges the allegations in paragraphs 1 through 131 of this Complaint and incorporates them by reference herein.

133. Defendants require Plaintiff and Class Members to submit non-public Private Information in the ordinary course of providing their services, and Defendant Optimizely's code executes on the very web pages where that Private Information is entered.

134. Defendants collected and processed the Private Information of Plaintiff and Class Members as part of their business.

135. Plaintiff and Class Members entrusted Defendants, directly or indirectly, with their Private Information with the understanding that Defendants would safeguard their information.

136. Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

137. By assuming the responsibility to collect and process this data, and, as to Defendant Optimizely, by assuming control over code that executes where this data is entered, Defendants had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

138. Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems, platforms, websites, and the personnel responsible for them, adequately protected the Private Information.

139. Defendants' duty to use reasonable security measures arose as a result of the special relationship that existed between Defendants, on the one hand, and Plaintiff and Class Members, on the other hand. That special relationship arose because Plaintiff and Class Members entrusted their confidential Private Information to Defendant Mutual of Omaha as a condition of receiving its services, and because Defendant Optimizely knowingly placed its code on the web pages where that Private Information was entered.

140. Defendant Mutual of Omaha also had a duty to properly vet, monitor, and audit Defendant Optimizely and any other vendor whose code it allowed to execute on its website, and to ensure that those vendors' data security measures were sufficient to protect Plaintiff's and Class Members' Private Information.

141. Defendant Optimizely also had a duty to prevent unauthorized persons from inserting code into its Clients' projects and distributing that code through its platform, and to timely detect and remove malicious code served through its platform.

142. Defendants had and continue to have duties to adequately disclose that Plaintiff's and Class Members' Private Information might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

143. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their platforms, websites, and systems, including the code served to and executed on Defendant Mutual of Omaha's website;

c. As to Defendant Optimizely, failing to implement adequate authentication, access, and change controls to prevent unauthorized persons from writing malicious code into its Clients' projects and distributing it through its platform;

d. As to Defendant Mutual of Omaha, failing to implement payment-page script controls, such as script authorization and integrity checks, Content Security Policy restrictions, and tamper detection, that would have prevented the malicious code from executing or transmitting Private Information;

e. As to Defendant Mutual of Omaha, failing to adequately vet, supervise, and monitor its third-party vendor Defendant Optimizely and ensure it had adequate data security measures in place to protect Plaintiff's and Class Members' Private Information;

f. Allowing unauthorized access to Class Members' Private Information;

g. Failing to detect in a timely manner that malicious code was capturing Class Members' Private Information; and

h. Failing to timely notify Plaintiff and Class Members of the Data Incident.

144. Defendants breached their duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

145. Defendants knew or should have known that their failure to implement reasonable data security measures to protect and safeguard Plaintiff's and Class Members' Private Information would cause damage to Plaintiff and the Class.

146. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

147. A compromise of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

148. It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the compromise was reasonably foreseeable given the known high frequency of cyberattacks, including web-skimming and third-party script attacks.

149. Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

150. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and processing Private Information through web pages that execute third-party code, and the critical importance of providing adequate security for that Private Information.

151. Plaintiff and the Class had no ability to protect their Private Information from malicious code that Defendants allowed to run on Defendant Mutual of Omaha's website.

152. Defendants were in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Incident.

153. Defendants' duties extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the

actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

154. But for Defendants' wrongful and negligent breaches of duties owed to Plaintiff and the Class, Plaintiff's and Class Members' Private Information would not have been compromised.

155. There is a close causal connection between Defendants' failure to implement security measures to protect Plaintiff's and Class Members' Private Information, and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. Private Information was captured and stolen as the proximate result of Defendants' failure to exercise reasonable care by adopting, implementing, and maintaining appropriate security measures.

156. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer injury, including, but not limited to, the following: (a) actual misuse of their compromised Private Information; (b) invasion of privacy; (c) lost or diminished value of Private Information; (d) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Incident; (e) loss of benefit of the bargain; (f) an increase in spam calls, texts, and/or emails; (g) the continued and certainly increased risk to their Private Information, which is now in the hands of cybercriminals; (h) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information; (i) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Incident; (j) the value of the

unauthorized access to their Private Information permitted by Defendants; and (k) any nominal damages that may be awarded.

157. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses including nominal damages.

158. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Incident.

159. Defendants' negligent conduct is ongoing, in that, upon information and belief, they have not implemented adequate controls to prevent malicious code from being distributed through Defendant Optimizely's platform or executed on Defendant Mutual of Omaha's website.

160. Plaintiff and Class Members are entitled to injunctive relief requiring Defendants to strengthen their data security systems and monitoring procedures, submit to future annual audits of those systems and monitoring procedures, and provide adequate credit monitoring to all Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

161. Plaintiff hereby repeats and realleges the allegations in paragraphs 1 through 131 of this Complaint and incorporates them by reference herein.

162. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect the Private Information entrusted to them. The FTC publications and orders described herein further form part of the basis of Defendants' duty to protect Plaintiff's and Class Members' Private Information.

163. Under the FTC Act, Defendants had a duty to use fair and adequate systems, platform and website security controls, and data security practices to safeguard Plaintiff's and Class Members' Private Information, including the payment card information entered on Defendant Mutual of Omaha's website.

164. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information and by failing to comply with applicable industry standards, as described in detail herein, including: as to Defendant Optimizely, by failing to prevent unauthorized persons from inserting malicious code into its Clients' projects and distributing it through its platform; and as to Defendant Mutual of Omaha, by failing to implement website security controls that would have blocked the malicious code or prevented it from transmitting Private Information to the cybercriminals, and by failing to verify that the third-party scripts and service providers it used and loaded on its website, including Defendant Optimizely, had implemented reasonable security measures.

165. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information collected through Defendant Mutual of Omaha's website and the foreseeable consequences of a data incident, including, specifically, the damages that would result to Plaintiff and Class Members in the event of such an incident, which ultimately came to pass.

166. Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect, as they are consumers whose Private Information Defendants collected and processed in the course of their business.

167. The harm that has occurred is the type of harm the FTC Act was intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that,

because of their failure to employ reasonable data security measures and avoid unfair practices, caused the same harm as that suffered by Plaintiff and Class Members.

168. But for Defendants' violations of Section 5 of the FTC Act, Plaintiff and Class Members would not have been injured.

169. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' violations of Section 5 of the FTC Act. Defendants knew or should have known that they were failing to meet their statutory duties and that their failure would cause Plaintiff and Class Members to suffer the foreseeable harms associated with the exposure of their Private Information.

170. Defendants' various violations and their failure to comply with applicable laws and regulations constitute negligence *per se*.

171. As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer injury, including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of their Private Information; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Incident, including, but not limited to, lost time; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their Private Information.

172. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Incident, and to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class Against Defendant Mutual of Omaha)**

173. Plaintiff hereby repeats and realleges the allegations in paragraphs 1 through 131 of this Complaint and incorporates them by reference herein.

174. Plaintiff and the Class entrusted their Private Information to Defendant Mutual of Omaha in connection with the services Defendant Mutual of Omaha provides, including as a condition of obtaining Defendant Mutual of Omaha's services. In so doing, Plaintiff and the Class entered into implied contracts with Defendant Mutual of Omaha by which Defendant Mutual of Omaha agreed to safeguard and protect such information, including by requiring and ensuring that its vendors do the same, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been compromised or stolen.

175. At the time Defendant Mutual of Omaha acquired the Private Information of Plaintiff and the Class, there was a meeting of the minds and a mutual understanding that Defendant Mutual of Omaha would safeguard the Private Information and not take unjustified risks when collecting and processing the Private Information.

176. Implicit in the agreements between Plaintiff and Class Members and Defendant Mutual of Omaha to provide Private Information was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, including by vetting and monitoring the vendors whose code it allowed to run on its website, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) collect the Private Information only under conditions that kept such information secure and confidential.

177. Plaintiff and the Class would not have entrusted their Private Information to Defendant Mutual of Omaha had they known that Defendant Mutual of Omaha would allow unvetted and unmonitored third-party code to execute on the web pages where they entered their Private Information.

178. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant Mutual of Omaha.

179. Defendant Mutual of Omaha breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their Private Information, including by failing to properly vet, audit, and monitor Defendant Optimizely and the code it delivered to Defendant Mutual of Omaha's website.

180. As a direct and proximate result of Defendant Mutual of Omaha's above-described breach of implied contract, Plaintiff and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

181. As a direct and proximate result of Defendant Mutual of Omaha's above-described breach of implied contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages to be determined at trial.

**COUNT IV**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**

**(On Behalf of Plaintiff and the Class Against Defendant Optimizely)**

182. Plaintiff hereby repeats and realleges the allegations in paragraphs 1 through 131 of this Complaint and incorporates them by reference herein.

183. Defendant Optimizely entered into contracts, written or implied, with its Clients, including Defendant Mutual of Omaha, to provide its web experimentation and related services. Upon information and belief, these contracts are virtually identical between and among Defendant Optimizely and its Clients whose customers and website visitors, including Plaintiff and Class Members, were affected by the Data Incident.

184. In exchange for payment, Defendant Optimizely agreed, in part, to implement adequate security measures to protect its Clients' websites and the end-users and visitors of those websites, including by preventing unauthorized code from being delivered through its platform. Defendant Optimizely in its Privacy Policies publicly represents that it has instituted several technical and organizational measures designed to protect Optimizely applications and that it uses intrusion detection and security monitoring tools on the servers that host its products.

185. These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members, the end-users and visitors of Defendant Optimizely's Clients' websites, were the intended third-party beneficiaries of the security obligations in the contracts between Defendant Optimizely and its Clients. Defendant Optimizely knew that if it were to breach these contracts with its Clients, its Clients' customers and website visitors, including Plaintiff and Class Members, would be harmed.

186. Defendant Optimizely breached the contracts it entered into with its Clients by, among other things, failing to (i) use reasonable data security measures, including authentication, access, and change controls sufficient to prevent unauthorized persons from writing malicious code

into its Clients' projects; (ii) monitor the integrity of the code it delivered through its platform; and (iii) promptly detect and remove the malicious code and notify its Clients and affected individuals.

187. Plaintiff and the Class were harmed by Defendant Optimizely's breach of its contracts with its Clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof, including actual, consequential, and nominal damages.

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

188. Plaintiff hereby repeats and realleges the allegations in paragraphs 1 through 131 of this Complaint and incorporates them by reference herein.

189. Plaintiff brings this claim individually and on behalf of all Class Members. This count is pleaded in the alternative to the breach of implied contract and breach of third-party beneficiary contract counts above (Counts III and IV).

190. Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including payments made by or on behalf of Plaintiff and Class Members, which, as to Defendant Optimizely, include the fees Defendant Mutual of Omaha pays Defendant Optimizely from revenue derived from Plaintiff and Class Members.

191. As such, a portion of the payments made by or on behalf of Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

192. Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, they purchased services from Defendant Mutual of Omaha and in so doing provided their Private Information on web pages that Defendants operated and on which Defendant

Optimizely's code ran, and that Defendant Optimizely used to provide paid services to Defendant Mutual of Omaha. In exchange, Plaintiff and Class Members should have received the services that were the subject of the transaction and appropriate protection for their Private Information.

193. Defendants knew that Plaintiff and Class Members conferred a benefit which Defendants accepted and appreciated. Defendants profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

194. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Rather than providing a reasonable level of security that would have prevented the Data Incident, Defendants instead calculated to increase their own profits at the expense of Plaintiff and Class Members by using cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite security.

195. Defendants acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices alleged herein.

196. If Plaintiff and Class Members knew that Defendants had not reasonably secured their Private Information, they would not have agreed to provide their Private Information on Defendant Mutual of Omaha's website.

197. Defendants failed to secure Plaintiff's and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiff and Class Members provided.

198. Under the principles of equity and good conscience, it would be inequitable for Defendants to retain the benefit conferred by Plaintiff and Class Members without paying its value,

because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

199. Plaintiff and Class Members have no adequate remedy at law.

200. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to, the injuries described herein.

201. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendants' services.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendants and that the Court grant the following:

a.) For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class;

b.) For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information;

c.) For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to data collection, processing, and safety, including controls over third-party code, and to disclose with specificity the type of Private Information compromised during the Data Incident;

d.) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

e.) Ordering Defendants to pay for lifetime credit monitoring services for Plaintiff and the Class;

f.) For an award of actual damages, compensatory damages, statutory damages and statutory penalties, in an amount to be determined, as allowable by law;

g.) For an award of punitive damages, as allowable by law;

h.) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i.) Pre- and post-judgment interest on any amounts awarded; and

j.) All such other and further relief as this Court may deem just and proper.

## VIII. JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: November 24, 2026

Respectfully submitted,

By: */s/ Leanna A. Loginov*
Leanna A. Loginov (NY Bar No. 5894753)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
lloginov@shamisgentile.com

*Attorney for Plaintiff and the Proposed Class*